## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

BRIAN BOOKER,                              )
      Plaintiff,                      )
                     )
v.                                         )    No. 2:23-cv-02725-SHL-tmp
DELTA AIR LINES, INC.,                     )
      Defendant.                      )

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUGDMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Both parties have filed motions for summary judgment. (ECF Nos. 45, 48.) Plaintiff Brian Booker seeks partial summary judgment on his claim that Defendant Delta Air Lines, Inc. failed to provide him with a reasonable accommodation under the Americans with Disabilities Act. (ECF No. 45 at PageID 189.) Delta seeks summary judgment on all of Booker's claims. (ECF No. 48 at PageID 474.) Because Booker is no longer pursing his claims under the Family Medical Leave Act (ECF No. 49 at PageID 1667 n.2 (sealed)), Delta's motion for summary judgment on those claims is **GRANTED**. But because all of Booker's remaining claims under the ADA and the Rehabilitation Act involve genuine disputes of material facts, Booker's motion and the remainder of Delta's motion are **DENIED**.

## FACTUAL BACKGROUND[1]

Booker started working for Delta as part of Airport Customer Service in 2018. (ECF No. 53-2 at PageID 2255.) He initially worked as a seasonal ramp agent. (ECF No. 49-1 at PageID 1689 (sealed).) In June 2021, he applied for and accepted a position as a Customer Service Agent. (ECF No. 53-2 at PageID 2255.) While working in that position, Booker was

---

[1] Unless otherwise noted, neither party disputed these facts in their statements of material facts.

responsible for checking in customers at the ticket counter, checking luggage, handling customer concerns, boarding flights at the departure gates, pulling the check bridges, and assisting with getting the flights and customers in and out of the airport.  (ECF No. 53-2 at PageID 2255.) Generally, his job was to perform the customer-facing tasks necessary for the day-to-day operations at Delta.  (ECF No. 49-1 at PageID 1691 (sealed).)  He performed those duties at the ticket counter, the departure gates, and the baggage service area.  (ECF No. 53-2 at PageID 2255.)

Six months after he started working as a Customer Service Agent, Booker notified his Station Manager, Kathy Lee, about his inability to stand without pain (id. at PageID 2257), and he received FMLA leave from December 17, 2021 through January 27, 2022 (ECF No. 49-1 at PageID 1694 (sealed)).  Four days into his leave, Dr. Katherine Ray diagnosed him with neuropathy in his feet and consistent knee and back pain.  (ECF No. 53-2 at PageID 2256.)  She advised him to sit for at least ten minutes each hour to help relieve the pain when he returned to work.  (Id.)

Booker did not return to work when his FMLA leave expired on January 27, 2022.  (ECF No. 49-1 at PageID 1694 (sealed).)   On February 18, 2022, he went to Campbell Clinic for the first time.  (ECF No. 53-2 at PageID 2256.)   Dr. Wes Owen, an orthopedic specialist, diagnosed him with bilateral knee pain, suspected patellar tendinitis, left foot sesamoiditis, and lower back pain.  (Id.)  Dr. Owen also stated that he needed to use a sitting stool to avoid prolonged standing or to take a ten-to-fifteen-minute break every hour.  (Id.)  Booker notified Lee that he would be able to return to work on March 8, 2022 with medical restrictions, and he provided her with a note from Dr. Owen describing those restrictions.  (ECF No. 49-1 at PageID 1695 (sealed).)

In that note, Dr. Owen recommended that Delta "allow Mr. Booker to use a sitting-stool

during his shift." (Id. at PageID 1695 (sealed).) If he would be unable to use a stool, he needed "to take a break every hour for 10–15 minutes." (Id.) The parties dispute whether Booker called Lee three days after he sent the note to clarify that he only needed to use the stool for ten minutes every hour consistent with Dr. Ray's recommendation in December 2021. (ECF No. 53-2 at PageID 2257–58.) Regardless, Lee referred Booker to the Workplace Accommodations Department. (ECF No. 53-2 at PageID 2258.) The parties agree that Lee never indicated that use of a stool was not feasible or posed a safety concern at that time. (Id.) And she did not investigate whether Booker could be reassigned to another position. (Id. at PageID 2259.) Booker remained on leave while Lee and Accommodations worked to determine whether they could provide him with a stool.

The Accommodations department asked Lee to investigate whether use of a stool would be possible. (Id. at PageID 2259–60.) In the meantime, Booker submitted a signed Medical Accommodation Request Form and an Authorization for Release of Medical Information to Accommodations. (Id. at PageID 2260.) Accommodations received the documents and told Booker that they would schedule a call in three weeks. (Id. at PageID 2261.) On April 13, 2022, Booker talked to the Accommodations team about his request so that they could begin evaluating whether and when he could return to work. (ECF No. 49-1 at PageID 1696 (sealed).) The parties dispute whether Accommodations informed Booker that his use of a stool would not be unreasonable. (ECF No. 53-2 at PageID 2261.) But they agree that no one asked Booker how long he would need to use the stool. (Id.)

Booker had another meeting with Accommodations on April 20, 2022, a week after the initial call. (Id.) During that teleconference, Lee preliminarily denied Booker's accommodation request even though Delta allowed stools at ticket counters at other airports. (Id. at PageID

3

2261–62.)  She never stated that the presence of a stool would violate a Delta policy, and she did

not say that the actual measurements of the respective work areas were too small to allow for a

stool.  (Id. at PageID 2262.)  She solely relied on her operational knowledge of those areas to

assert that a stool would present spatial problems.  (Id. at PageID 2262–63.)  The parties dispute

whether a human resources representative told Booker that other agents would get jealous if he

used a stool behind the ticket counter.  (ECF No. 55-2 at PageID 2363–64.)  They also dispute

whether Lee stated that TSA regulations prevented the use of a stool.  (ECF No. 53-2 at PageID

2262.)  But they agree that Lee knew TSA agents used chairs to sit behind the ticket counter.

(Id. at PageID 2262–63.)

Despite denying Booker's request for a stool at the beginning of the meeting on April 20,

Lee stated at the end of the same meeting that she would need to conduct more research to see if

a stool would be possible because she had not conducted a survey of the Memphis Airport in a

long time.  (Id. at PageID 2262.)  No one told Booker that Delta's employees used stools at other

airports, and no one asked him to propose a specific type of stool.  (Id. at PageID 2261.)  Instead,

he relied on Delta to inform him of different stool options—indeed, Delta did not inform him of

the measurements of the relevant work areas so that he could research which stools would fit in

those areas.  (Id.)  Although Lee told Booker she would contact him with answers after the

meeting, she did not do so.  (Id. at PageID 2262.)

After that teleconference on April 20, Lee consulted with the airport's Safety Specialist to

discuss the possibility of a stool.  (ECF No. 49-1 at PageID 1698–99 (sealed).)  The Specialist

referred Lee to Delta's Lean Stool policy.  (Id. at PageID 1699 (sealed).)  Even though a lean

stool would not meet Booker's medical needs, Lee used the policy to decide whether a sitting

stool would be feasible.  (Id.)  The policy stated that there "must be adequate clearance in the

work area to enable the use of" the stool.  (Id.)  It incorporated an OSHA regulation stating that twenty-eight inches of walking space must be present between the back of the stool and the back of the wall or baggage belt.  (Id.)  The policy clarified that this area "must remain clear of temporary or permanent obstacles" like "baggage."  (Id.)  Lee limited her search to the single stool on delta.net.  (ECF No. 53-2 at PageID 2264.)

Once she understood the policy, Lee contacted Delta's Corporate Real Estate department to assist with taking measurements of the ticket counter and gate counters.  (ECF No. 49-1 at PageID 1700 (sealed).)  She never notified Booker about taking the measurements and did not ask him to come see why a stool would not be feasible.  (ECF No. 53-2 at PageID 2263–64.)  On May 9, 2022, Lee emailed Accommodations and HR a photograph and her measurements of the ticket counter.  (Id. at PageID 2264.)  She did not notify Booker because she did not think it would be appropriate to do so.  (Id.)

Lee formally denied Booker's request in June 2022 after measuring the relevant workstations.  (Id. at PageID 2264–65.)  Accommodations never told Lee that she could only assess the particular model of leaning stool officially authorized by Delta, (ECF No. 55-2 at PageID 2365), and she never looked at any other stools that could fit in the relevant areas, (id. at PageID 2363, 2365).  Delta claimed that an OSHA regulation prohibited the use of a stool at the ticket counter and departure gates.  (ECF No. 53-2 at PageID 2264–65.)  However, the parties dispute whether the regulation applies at departure gates.  (Id. at PageID 2265.)  And the parties dispute whether the regulation prevents the use of a stool behind some of the ticket counters based on the actual measurements of the area.  (Id.)

Lee never offered to allow Booker to use a stool on a trial basis to see if it would work out.  (ECF No. 55-2 at PageID 2366.)  The parties agree that Lee previously allowed employees

to use sitting stools during the COVID pandemic. (ECF No. 55-2 at PageID 2367.) But they dispute whether she regularly permitted the use of stools before the pandemic and whether she told her employees not to sit on stools when customers were present because it did not look professional. (Id.)

In lieu of providing a stool, Delta invited Booker to participate in its Alternative Assistance Program from July 3, 2022 until October 1, 2022. (ECF No. 53-2 at PageID 2266.) The parties dispute the mechanics of the program, (ECF No. 49-1 at PageID 1703 (sealed)), but they agree that it lasted for ninety-days, and it provided information about open positions at Delta (ECF No. 53-2 at PageID 2266). Two of the open positions were located over one hundred miles away from Memphis. (Id.) Only one position was available in Memphis, and it was a Sky Club position. (Id.) As soon as Booker indicated interest in the position, Delta notified him that he could not apply for it because it was posted in error. (Id.) Although those were the only three positions offered through the assistance program, Booker requested to be reassigned to a night shift position or to the baggage area, and he also suggested modifying his hours to part time.[2] (Id.) Delta never reassigned him to a new position or modified his hours.

In the end, Booker never obtained alternative placement during the ninety-day program. He filed a Charge of Discrimination with the EEOC against Delta on October 31, 2022, after the program ended. (ECF No. 55-2 at PageID 2369.) He specifically named Lee for refusing to accommodate him. (Id.) Indeed, the parties agree that Lee did not look for alternative positions for him at the time she decided that he could not perform his duties because he needed a stool

_____

[2] Delta disputes whether Booker made these alternative requests during the relevant period. However, Delta fails to cite to any materials in support of its opposition. (ECF No. 53-2 at PageID 2267.) Thus, for purposes of summary judgment, it is considered undisputed. See Fed. R. Civ. P. 56(e)(2).

that Delta could not provide.  (ECF No. 53-2 at PageID 2267.)

After he filed the charge with the EEOC, on January 10, 2023, Booker complained to the HR manager and Lee about station leadership and Lee's failure to assist him in returning to work.  (ECF No. 55-2 at PageID 2365.)  Around the same time, Booker independently applied for an Operations Service Manager position as a way to return to work.  (ECF No. 53-2 at PageID 2267–68.)  He informed Accommodations about his application on January 13, 2023, but no one responded.  (Id.)  The job posting stated that a qualified candidate would possess a bachelor's degree or equivalent experience.  (Id. at PageID 2268.)  Booker had a bachelor's degree.  (Id.)  Lee knew that Booker applied for the position, but she decided not to interview him.  (Id. at PageID 2268–69.)  Instead, she interviewed and hired a candidate without a degree.  (Id. at PageID 2267–68.)  The candidate she hired had some previous supervisory experience at Delta.  (ECF No. 49-1 at PageID 1706 (sealed).)

The next month, on February 14, 2023, Booker again expressed his ability and interest in returning to work on the night shift because it would not require him to stand as much.  (ECF No. 53-2 at PageID 2269.)  While waiting to find an alternative placement, Booker underwent another medical examination.  (Id.)  On April 21, 2023, Dr. James Hubbard confirmed Booker's diagnosis but relaxed his medical restrictions to avoid standing for more than one hour and forty-five minutes without sitting for fifteen minutes or, in the alternative, to use a standing stool for at least thirty minutes during every two hours of work.  (Id.)  The parties dispute whether Delta conducted a reevaluation of Booker's ability to perform his job after his medical restrictions changed.  (Id. at PageID 2269–70.)

In the meantime, Booker applied for a night shift position outside of the accommodations process through Delta's Career Services website.  (Id.)  The job was set to begin on May 29,

2023.  (Id.)  However, Accommodations got involved, delayed the start date, and scheduled a

meeting in June.  (Id. at PageID 2270.)  At the meeting, Booker met with representatives from

Accommodations and HR to discuss the night shift position.  (Id.)  On June 2, he complained to

HR and Lee that Accommodations had yet to provide a reasonable accommodation, and Lee was

responsible for failing to return him to work.  (ECF No. 55-2 at PageID 2365.)  Between May

and August 2023, while Accommodations was assessing whether Booker could return to work on

the night shift, another position in the Sky Club opened for applications.  (ECF No. 53-2 at

PageID 2270.)  No one notified Booker about the position despite his previous request for

transfer to that position.  (Id.)  On August 25, Delta announced that it hired another individual for

that role, and that individual would begin work at the end of the month.  (Id.)

Ultimately, Delta allowed Booker to return to work in the night shift position on a trial

basis starting on August 14, 2023.  (ECF No. 53-2 at PageID 2270–71.)  As soon as Booker

returned to work, he received a Final Corrective Action Notice for a violation of the Buddy Pass

policy that occurred while he was on leave on May 27, 2022.  (ECF No. 49-1 at PageID 1708

(sealed).)  The Buddy Pass system allows friends and family members of Delta employees to

purchase plane tickets at a discount.  (Id.)  Employees are directly responsible for the behavior of

their buddies.  (Id. at PageID 1708–09 (sealed).)  Booker's buddy failed to declare a firearm in

his checked baggage, and TSA discovered it during the screening process.  (Id. at PageID 1709

(sealed).)  Booker received a final notice as soon as he returned to work because Delta does not

generally issue disciplinary actions to employees while they are on leave.  (Id. at PageID 1710

(sealed).)  Booker had no active discipline on file when he received the final notice.  (ECF No.

55-2 at PageID 2368.)  The final notice is the last step in Delta's four-step progressive

disciplinary structure.  (ECF No. 49-1 at PageID 1705 (sealed).)

A month after Booker returned to work on the night shift, Delta discontinued his position, which left Booker out of work once again.  (ECF No. 53-2 at PageID 2271.)

## APPLICABLE LAW

A court must grant summary judgment when the moving party shows that there is no "genuine dispute" of "material fact."  Fed. R. Civ. P. 56(a).  The moving party can satisfy its burden by showing that the nonmoving party has no evidence to support his cause.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party does so, the burden shifts to the nonmoving party to go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  Moldowan v. City of Warren, 578 F.3d 351, 374 (6th Cir. 2009) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The "mere existence of some alleged factual dispute" is not enough to defeat a properly supported motion— only disputes about facts that "might affect the outcome of the suit" are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a reasonable jury could decide for the nonmovant, then a genuine dispute of material fact exists.  Blanchet v. Charter Comms., LLC, 27 F.4th 1221, 1226 (6th Cir. 2022) (citing Anderson, 477 U.S. at 255).

The court's role is not "to weigh the evidence and determine the truth of the matter."  Moldowan, 578 F.3d at 374 (quoting Anderson, 477 U.S. at 249).  Instead, it views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party.  Kleiber v. Honda of Am. Mgf., Inc., 485 F.3d 862, 868 (6th Cir. 2007).  The fact that both parties filed motions for summary judgment does not necessarily mean that the court must grant one of them and deny the other.  Appoloni v. United States, 450 F.3d 185, 189 (6th Cir. 2006) (quoting Parks v. LaFace Records, 329 F.3d 437, 444 (6th Cir. 2003)).  Each motion is evaluated on its own merits.  Id. (quoting Westfield Ins. Co. v. Tech. Dry, Inc., 336 F.3d 503, 506 (6th Cir. 2003)).

## ANALYSIS

Booker asserts that Delta violated both the ADA and the Rehabilitation Act[3] by (1)
failing to provide him with a reasonable accommodation, (2) engaging in disparate treatment
based on his disability, and (3) retaliating against him for seeking an accommodation. Booker
seeks summary judgment on the first claim, and Delta seeks it on all three. The Court addresses
each claim in turn.

## I.    FAILURE TO ACCOMMODATE

Employers who discriminate against a qualified individual based on disability may be
held liable under the ADA. 42 U.S.C. § 12112(a). One form of disability discrimination occurs
when an employer fails to reasonably accommodate an individual with a disability. §
12112(b)(5)(A). A failure to accommodate claim necessarily involves direct evidence of
discrimination. Blanchet, 24 F.4th at 1227. Under the direct evidence test, Booker has the initial
burden to prove that (1) he has a disability; (2) he is otherwise qualified for the position and
could perform the essential functions of the job, with or without a reasonable accommodation;
(3) Delta knew about his disability; (4) he requested an accommodation; and (5) Delta failed to
provide the requested accommodation. See O'Donnell v. Univ. Hosp. Cleveland Med. Cnt., 833
Fed. App'x 605, 614 (6th Cir. 2020) (citing Mosby-Meachem v. Memphis Light, Gas & Water
Div., 883 F.3d 595, 603 (6th Cir. 2018)). If Booker proves his prima facie case, the burden shifts

---

[3] The parties agree that the Rehabilitation Act is "parallel" to the ADA. (ECF No. 48-1 at
PageID 488–89; ECF No. 49 at PageID 1673 n.4 (sealed).) While there are some differences
between the two statutes, the parties generally rely on the outcomes of Booker's ADA claims as
a threshold to gauge whether the Rehabilitation Act claims should live or die. The Court follows
suit. See Mahon v. Crowell, 295 F.3d 585, 588–89 (6th Cir. 2002) (recognizing that the
Rehabilitation Act explicitly states that ADA standards should apply in cases alleging
employment discrimination) (quoting McPherson v. Mich. High Sch. Athletic Ass'n, 119 F.3d
453, 459–60 (6th Cir. 1997)); see also 29 U.S.C. § 794(d) (incorporating ADA standards to
determine violations).

to Delta to show that accommodating him "would impose an undue hardship" on Delta.  See id.

If an employee requests an accommodation, the ADA also imposes an independent duty on the employer to engage in an "individualized inquiry" through "an 'interactive process' to determine whether the employee's disability disqualifies" him from a particular position.  Id. at 617 (quoting 29 C.F.R. § 1630.2(o)(3)).  The employer must "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  Hostettler v. College of Wooster, 895 F.3d 844, 857 (6th Cir. 2018) (quoting Mosby-Meachem, 883 F.3d at 605–06)).  To do so, the employer must consider the employee's personal characteristics, his medical condition, and the effect the condition may have on his ability to perform his job.  Keith v. County of Oakland, 703 F.3d 918, 923 (6th Cir. 2013) (citing Holiday v. City of Chattanooga, 206 F.3d 637, 643 (6th Cir. 2000)).  If Booker proves that he requested a reasonable accommodation and Delta failed to engage in this interactive process in good faith, then that failure is an "independent violation of the ADA."  See Rorrer v. City of Stow, 743 F.3d 1025, 1041 (6th Cir. 2014) (citing Keith, 703 F.3d at 924).

At this stage, Delta does not dispute that Booker has a disability, he is otherwise qualified for the position, it knew about his disability, he requested an accommodation, and it declined to provide that specific accommodation.[4]  (ECF No. 53-1 at PageID 2246; see also ECF No. 48-1 at PageID 488–93.)  Thus, two questions remain: (1) whether Delta failed to provide a reasonable accommodation and (2) whether it failed to engage in the interactive process in good faith.  As

_____

[4] After confirming that "Delta does not dispute that Booker can establish the first four elements" of his failure to accommodate claim, Delta then mistakenly asserts that it disputes the fourth element.  (ECF No. 53-1 at PageID 2246.)  It is clear from the briefing, however, that Delta does not dispute that Booker can state a prima facie case at all—it merely argues that, even though it did not provide the requested accommodation, it did provide a reasonable one.  (Id. ("Delta does dispute the fourth [sic] element, as it plainly provided Booker with a reasonable accommodation, though it was unable to provide the accommodation he requested.").)

11

discussed below, both issues involve genuine disputes of material fact. Thus, summary judgment is inappropriate.

As a threshold matter, the parties do not agree on the specific accommodation Booker requested. Booker testified that he called Lee on March 1, 2022 to clarify that he only needed to use a stool for ten minutes per hour.[5] (ECF No. 49-1 at PageID 1695 (sealed).) Delta asserts that Booker mischaracterizes the accommodation that he requested—he submitted a note from an orthopedic specialist stating that he needed to either use a sitting stool during his shift or take a ten-to-fifteen-minute break every hour.[6] (ECF No. 55 at PageID 2330.) Either way, Booker does not argue that a ten-to-fifteen-minute break would have been reasonable, and the parties do not dispute that Booker requested a stool for some period. The dispute about the accommodation at issue also indicates there is a genuine dispute of material fact about whether Delta engaged in the interactive process in good faith.[7]

It appears that Delta made no offer of the use of a stool as an accommodation, and it is true that Delta cannot be held liable for refusing to "offer an accommodation that is expressly prohibited by binding federal law." See Bey v. City of New York, 999 F.3d 157, 168 (2d Cir. 2021); see also 29 C.F.R. § 1630.15(e) (explaining that the prohibition of a particular accommodation by a federal regulation "may" provide a defense to a charge of discrimination).

---

[5] Although Delta disputes whether he conveyed this request to Lee, it does not dispute that Dr. Katherine Ray advised Booker that he needed to sit for at least ten minutes per hour while at work to avoid prolonged standing. (ECF No. 53-2 at PageID 2256.)

[6] Delta argues that Booker has no evidentiary support to show that he did in fact communicate this request to Lee. (ECF No. 53-2 at PageID 2257–58.) But Booker's deposition testimony that he did tell Lee about this request is sufficient to create a genuine dispute of material fact, and the Court cannot weigh credibility to decide whether he is telling the truth.

[7] If Booker did clarify that he only needed a stool for ten minutes every hour and Delta failed to take that into consideration, then that could amount to a violation of its duty to engage in the process in good faith.

Otherwise, Delta would be forced "to pick between ADA liability on the one hand and administrative penalties on the other." Bey, 999 F.3d at 168 (quoting McNelis v. Penn. Power & Light Co., 867 F.3d 411, 416 n.2 (3d Cir. 2017)). But this defense "may be rebutted" by showing (1) pretext or (2) that the federal regulation either did not prevent the accommodation or that there was a nonexclusionary means of compliance. 29 C.F.R. App. § 1630.15(e).

Delta argues that providing a stool would have either imposed an undue hardship or would have been unreasonable because there is not sufficient space for one. It asserts that the presence of a stool behind the ticket counters and at the departure gate would have violated OSHA requirements given the operational realities of those workstations. Delta asserts that bags often pile up behind the ticket counters, and there is very little room at the departure gates. Booker contends that the OSHA defense fails because it is pretextual—Delta initially denied Booker's request for a stool before measuring the space and before considering different stool sizes.[8] Moreover, he contends that the presence of the stool would not violate any OSHA regulation. Both parties agree that at the meeting on April 20, 2022, Lee simply stated that a stool would not fit in those spaces. (ECF No. 53-2 at PageID 2262.) Given this conflicting proof, neither party has shown that the facts indisputably support their position on the use of the stool.

Thus, a reasonable jury could find that Delta's OSHA defense is pretextual. Indeed, Lee preliminarily denied Booker's request for a stool before she measured the areas in question and without any particular stool in mind, and she did so without reference to OSHA at all. When she did measure the areas in question, she neglected to invite Booker to join her so that he could

---

[8] Booker also testified that Lee originally justified Delta's refusal to provide a stool based on a TSA regulation, although she could not identify the regulation at issue. (ECF No. 53-2 at PageID 2262.) Delta asserts that Lee never referenced a TSA regulation at all. (Id.)

understand her reasoning.

Moreover, even if Delta's defense is not pretextual, a reasonable jury could find that OSHA does not prevent Booker's use of a stool behind the ticket counter or at the departure gate. Dr. Michael Collins opines that the actual measurements for four of the six counter positions behind the ticket counter—twelve workstations respectively—prove that the use of a stool would not violate OSHA, and the regulation at issue does not even apply to the departure gate area. Because there is sufficient space at most of the positions behind the ticket counter according to the evidence offered by Booker, Booker asserts that he could have been assigned to one of them and his use of a stool would not have violated OSHA. Booker also argues that Delta previously allowed its employees to use stools behind the counter,[9] and even the TSA agents occasionally sit in chairs.

However, a reasonable jury could also find that the use of a stool behind the ticket counters and at the departure gate would impose an undue hardship given the operational realities of those workstations. Delta's measurements of the area behind the ticket counter

---

[9] Lee initially testified at her deposition that Delta discontinued the use of stools at the ticket counter when TSA installed new equipment in that area. She then stated in her affidavit that the only time period she authorized the use of stools was during the COVID pandemic, when flight traffic was low and consequently there was no baggage gathering behind the ticket counters to obstruct foot traffic. She discontinued their use when flight traffic resumed. But Booker submitted the affidavit of Yourlandwra Pickens, who stated that she personally used and observed her coworkers using stools behind the ticket counter while working for Delta from 2008 until she was recently reassigned to the Sky Club Lounge. She stated that Lee permitted the use of the stools, but she did not want her employees using them when customers were present because it did not look professional. Although Delta objected to Lee's statement to Pickens as hearsay, it is nonhearsay because it is a statement by a party opponent under Federal Rule of Evidence 801(d)(2)(D)—as Delta's Station Manager, Lee was Delta's agent and her statements about the use of chairs at workstations was a matter within the scope of her employment. Regardless, Booker is not using the statement for the truth of the matter asserted. Instead, he is using it to show that Lee knew about the use of stools and was solely concerned about how it appeared to customers, not whether it posed safety risks.

contradict Booker's measurements.  Lee testified that the areas behind the ticket counters are

often filled with baggage waiting to be screened by TSA, which is not within Delta's control.

And Lee asserts that it would not be feasible to solely assign Booker to a particular computer

terminal with more space because Delta's operation requires immense flexibility, and she needs

each of her employees to be able to perform any given task at any given time.  The departure

gate is even smaller than the ticket counter—people must scoot past each other to navigate it.  In

essence, the facts do not indisputably support one position or the other, but rather credibility will

be key at trial.

Delta also argues that Booker cannot force it to provide a specific accommodation if it

offers another reasonable accommodation.  See Talley, 542 F.3d at 1108.  It asserts that it did

provide Booker with a reasonable accommodation, even if it was not the accommodation he

sought.  Delta allowed Booker to remain on medical leave and enroll in its ninety-day

Alternative Placement Assistance program, which Booker could utilize to identify an open

position that met his medical restrictions.  But reassignment is "only considered when

accommodation within the individual's current position would pose an undue hardship."

Cassidy v Detroit Edison Co., 138 F.3d 629, 634 (6th Cir. 1998) (citing Pattison v. Meijer, Inc.,

897 F. Supp. 1002, 1007–08 (W.D. Mich. 1995)); see 29 C.F.R. App. 1630.2(o).  Thus,

providing for continued leave and placing Booker in the APA program would only be reasonable

if Delta can establish that providing a stool would impose an undue hardship.

It is true that Delta is not required to reassign Booker to a position he is not qualified for,

and it does not have to "waive legitimate, non-discriminatory employment policies or displace

other employees' rights in order to accommodate" him.  See Hendrick v. Western Reserve Care

Sys., 355 F.3d 44, 457 (6th Cir. 2004) (Burns v. Coca-Cola Enter., Inc., 222 F.3d 247, 256 (6th

Cir. 2000)).  It must only reassign him to a comparable position "if the position is vacant within a reasonable amount of time."  Id.  But there is a question of fact as to whether this ninety-day program truly qualifies as an alternative reasonable accommodation.  At the very least, there is a question about whether ninety days is a reasonable amount of time to locate another position, particularly given that there were only three positions available for Booker during that period—two of which were over one hundred miles away at a different facility, and one of which was immediately withdrawn as soon as Booker indicated interest in it.

Enrollment in the APA program is not the functional equivalent of alternative placement, and a jury should determine whether Delta engaged in the interactive process in good faith by simply enrolling Booker in the program.  Despite his requests to be reassigned to either a night shift or baggage position, and despite his suggestion to modify his hours to part time, Booker never obtained alternative placement during the relevant period.  When it expired, Delta considered Booker's case closed.  Although it is not clear as a matter of law, a reasonable jury could find that the APA program does not qualify as a reasonable alternative accommodation by itself.

Ultimately, a determination on whether a proposed accommodation is reasonable "is a question of fact."  Blanchet, 27 F.4th at 1229–30.  Here, the facts are diverse and contradictory—depending on which facts are given more weight, they could support either party's position on both (1) the reasonableness of the stool and placement in the APA program and (2) whether Delta engaged in the interactive process in good faith.  Thus, Booker's motion and Delta's motion as to the failure to accommodate claim are both **DENIED**.  The remaining claims likewise present genuine disputes of material facts.

16

## II.     DISPARATE TREATMENT

Delta also seeks summary judgment on two of Booker's disparate treatment claim.

Booker alleges that Delta discriminated against him based on his disability because it (1) failed

to interview him for a managerial position in January 2023 and (2) issued him a Final Corrective

Action Notice when he returned from medical leave in August 2023.[10]  (ECF No. 49 at PageID

1679–80 (sealed).)  The parties agree that these two claims are based on circumstantial evidence.

To prove a disparate treatment claim based on circumstantial evidence, Booker must

show that (1) he has a disability; (2) he is otherwise qualified to perform the essential functions

of his position, with or without an accommodation; and (3) he suffered an adverse employment

action because of his disability.  See Demyanovich v. Cadon Plating & Coatings, LLC, 747 F.3d

419, 433 (6th Cir. 2014) (citing Talley, 542 F.3d at 1105).  For purposes of summary judgment,

Delta does not dispute that Booker can state a prima facie case for these two claims.  (ECF No.

48-1 at PageID 494.)  Thus, the burden shifts to Delta to rebut the presumption of discrimination

by articulating a "legitimate non-discriminatory reason for taking the challenged employment

action."  See O'Donnell, 833 F. App'x at 619 (citing McDonnel Douglas Corp. v. Green, 411

U.S. 792, 802 (1973)).

First, Delta asserts that Lee decided not to interview Booker and numerous other

applicants for the managerial position because she desired a candidate with prior front line

---

[10] In his response, Booker clarifies that he is also pursuing a third claim of disparate treatment—
he alleges that Delta discriminated against him by failing to consider him for the Sky Club
position in August 2023, despite being involved in the interactive process and Delta's knowledge
of his interest in that position.  Booker notes that Delta did not seek summary judgment on this
claim and it should therefore be tried.  In Delta's reply, it asserts that Booker cannot show that its
failure to interview him for that position would qualify as an adverse employment action because
he never applied for it.  But Delta does not dispute that it did not originally seek summary
judgment on that claim.  Relatedly, it does not address whether Booker properly pled that claim
in his complaint.  Thus, the Court will not consider those issues here.

supervisory experience, and Booker did not have any.  Second, Delta states that it issued a Final

Corrective Action Notice the day Booker returned from medical leave because it is Delta's

policy to refrain from taking disciplinary action against employees who are on medical leave.

Instead, Delta typically waits until an employee has returned to work to issue discipline.  Delta

also asserts that Booker admitted fault for the Buddy Pass violation that resulted in the notice.

Booker does not argue that these proffered justifications are not legitimate non-discriminatory

reasons on their face.  Instead, he argues that they are pretextual.

Because Delta has articulated legitimate reasons for its actions, the burden shifts back to

Booker to prove that Delta's proffered reasons are pretext to hide discriminatory intent.  See id.

Booker must prove that each proffered reason either (1) has no basis in fact, (2) did not actually

motivate Delta's decision, or (3) was insufficient to motivate Delta's decision.  See id. (citing

Chen v. Dow Chemical Co., 580 F.3d 394, 400–01 (6th Cir. 2009)).  At the summary judgment

stage, Booker need only produce enough evidence "to rebut, but not to disprove," Delta's

proffered rationale.  See Griffin v. Finkbeiner, 689 F.3d 584, 594 (6th Cir. 2012) (quoting Blair

v. Henry Filters, Inc., 505 F.3d 517, 532 (6th Cir. 2007), overruled on other grounds by Gross v.

FBL Fin. Servs., Inc., 557 U.S. 167 (2009)).  He has done so here.

One way to show that a defendant's proffered justification did not actually motivate its

decision is to prove that the defendant failed to follow its own stated policy.  See DeBoer v.

Musashi Auto Parts, Inc., 124 F. App'x 387, 395 (6th Cir. 2005).  Here, the job requirements for

the managerial position included a bachelor's degree or equivalent experience.  Delta does not

dispute that Booker has a bachelor's degree, nor does it dispute that the candidate it hired did not

have one—it solely argues that Booker was not qualified because he did not have prior front line

supervisory experience at Delta, and the candidate it hired did.  Looking at the facts in the light

18

most favorable to Booker, as the Court must at this stage, he has presented enough evidence to rebut Delta's proffered rationale.  The job posting itself states that a candidate would need both (1) a bachelor's degree or equivalent experience and (2) previous leadership experience, which indicates that previous leadership experience does not necessarily qualify as the equivalent of a bachelor's degree.  It also indicates that a college degree and three years of Airport Customer Service experience would give an applicant a competitive edge—Booker checked both of those boxes.  Even though he was qualified on paper, Lee chose not to interview him, despite the need to explore alternative positions for Booker as an accommodation.  A reasonable jury could find that Lee's proffered reason for choosing not to interview Booker was pretext for discrimination.

Booker also asserts that the decision to issue a Final Corrective Action Notice for his violation of the Buddy Pass policy constitutes disability discrimination because that level of discipline is unprecedented and disproportional to other individuals with similar infractions.  Booker had no previous discipline in his file, and the notice placed him one step short of termination.  Booker argues that he was the only person at the Memphis airport to receive a final notice for this offense in the past five years, and he testified that Lee told him that she would not normally issue this level of discipline.  The parties do not dispute that Booker submitted a written complaint to HR that the final notice was "leverage" to address the terms of his return from disability.  (ECF No. 55-2 at PageID 2368.)  Delta then amended the notice to remove language that Lee originally included, language implying that Booker's personal conduct was at issue, but it did not investigate Booker's claims of discrimination.  He also argues that his co-worker's violation of the same policy only resulted in a six-month suspension of her travel privileges, even though the person using her buddy pass acted aggressively by yelling profanity and making inappropriate comments to a gate agent about their national origin.  His co-worker

19

also already had active discipline on file.

Delta reasons that, even though no other employees at the Memphis airport received a final notice for this infraction in the last five years, employees at other locations had received one. And Booker's violation was comparatively severe—it involved an undeclared firearm and ammunition. Once again, looking at the facts in the light most favorable to Booker, his testimony that Lee said she would not normally issue this level of discipline, among other things, creates a genuine dispute of material fact. Thus, Delta's motion for summary judgment on the disparate treatment claims is **DENIED**.

## III.   RETALIATION

Lastly, Delta seeks summary judgment on Booker's retaliation claims. Requests for accommodation are "protected acts" under the ADA. Hurtt v. Int'l Servs., Inc., 627 F. App'x 414, 423 (6th Cir. 2015) (citing A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 698 (6th Cir. 2013)). Thus, an employer cannot retaliate against an employee for requesting an accommodation. Id. Delta only[11] challenges Booker's claims that it retaliated against him by (1) failing to interview him for the managerial position and (2) issuing a Final Corrective Action Notice when he returned from leave. Because these claims also involve circumstantial evidence, they are analyzed under the same framework as Booker's disparate treatment claims. Here, however, Booker must also prove a fourth element, specifically that there was a causal connection between his request for an accommodation and the adverse actions. Rorrer, 743 F.3d at 1046 (citing A.C., 711 F.3d at 697. But asserting "a prima facie case of retaliation is a 'low

---

[11] Once again, Booker asserts that he alleges additional claims that Delta omitted from its motion, specifically that Delta failed to consider him for the SKY Club position and that Delta and Lee deliberately and unreasonably delayed his accommodations process. Because Delta did not address those claims in its motion and does not argue that they were not properly pled in the complaint, the Court does not consider them here, leaving them as claims in this matter.

hurdle.'" Id. (quoting Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001)).  Booker's

burden at this stage is "minimal."  See Dixon v. Gonzales, 471 F.3d 324, 333 (6th Cir. 2007)

(citing EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)).  All he must do is

"put forth some credible evidence that enables the court to deduce that there is a causal

connection between the retaliatory action and the protected activity."  Id. (citing Avery, 104 F.3d

at 861).

Delta argues that the challenged actions are too remote to be causally connected to

Booker's request for an accommodation.  Delta resolved Booker's request for an accommodation

by June 2022.  Lee decided not to interview him for the managerial position seven months later,

and she issued the Final Corrective Action Notice seven months after that.  Delta asserts that the

challenged actions are not temporally related to Booker's accommodation request and thus

Booker cannot satisfy the fourth element to assert a prima facie case.

Although temporal proximity "always plays a role in establishing a causal connection,"

proximity alone "cannot establish a causal connection" and "its significance depends on the

context."  Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 675 (6th Cir. 2013).  When "some time

elapses between when the employer learns of a protected activity and the subsequent adverse

employment action, the employee must couple temporal proximity with other evidence of

retaliatory conduct to establish causality."  Id. (quoting Mickey v. Zeidler Tool & Die Co., 516

F.3d 516, 525 (6th Cir. 2008)).  Multi-year gaps are fatal.  Id. (citing Clark Cnty. Sch. Dist. v.

Breeden, 532 U.S. 268, 273–74 (2001)).  The time period required to support an inference of

retaliation based on temporal proximity alone is "usually less than six months."  Nguyen v. City

of Cleveland, 229 F.3d 559, 566–67 (6th Cir. 2000) (quoting Parnell v. West, No. 95-2131, 1997

WL 271751, at *3 (6th Cir. May 21, 1997)).

Booker argues that Delta construes the timeline too narrowly and omits key facts.  In July 2022, Booker complained that Delta's failure to return him to work was discriminatory.  As of August 2022, he was still trying to find alternative placement at Delta.  And, in October 2022, Booker finally filed an EEOC Charge of Discrimination and cited Lee's actions in support of his claim.  Three days before he applied for the managerial position that Lee refused to interview him for, he also complained to Delta's HR manager about Lee's failure to address his accommodation requests.

Booker asserts that the temporal connection to the Final Corrective Action Notice is much closer.  During the three-month period before he received the notice, Booker continuously pushed for an accommodation that would allow him to return to work.  In June 2023, Booker again complained to Lee and HR about Lee's refusal to allow him to return to work on the night shift, which would not require an accommodation for his physical restrictions.  That same month, Delta consented to Booker's reassignment to the night shift.  The first day he reported to work, and the first day that Lee had the opportunity to discipline Booker, she issued the notice.  Booker testified that Lee told him that she would not normally issue this degree of discipline.

Looking at the facts in the light most favorable to Booker, there is some evidence that would permit a reasonable jury to deduce a causal connection between Booker's continued crusade for an accommodation and the challenged actions.  As with the disparate treatment claims, once Booker states a prima facie case of retaliation, the burden shifts to Delta to articulate a legitimate, non-discriminatory reason for the challenged action, and then the burden shifts back to Booker to show pretext.  Dixon v. Gonzales, 471 F.3d 324, 333 (6th Cir. 2007).  Both parties reincorporate their respective arguments about why Booker can or cannot show pretext for the disparate treatment claims.

22

The Court will not rehash the same analysis here.  Because it finds that there are genuine disputes of material fact that would allow a reasonable jury to find that Delta's proffered reasons are pretextual in the disparate treatment context, the Court reaches the same conclusion here. Thus, Delta's motion for summary judgment is **DENIED**.

## CONCLUSION

Because Booker does not defend his FMLA claims, Delta's motion for summary judgment with respect to those two claims is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE**.  But genuine disputes of material fact exist for his remaining claims under the ADA and Rehabilitation Act.  Thus, both Booker's motion for partial summary judgment and Delta's motion for summary judgment are **DENIED**.  Booker's claims under the ADA and Rehabilitation Act for failure to accommodate, disparate treatment, and retaliation will proceed to trial.

**IT IS SO ORDERED,** this 25th day of March, 2025.

s/ Sheryl H. Lipman_____
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE